We will begin. For those of you gentlemen, I don't know if you have both argued here before, but we follow our lighting system here. You'll see on the podium the green light of course means to continue with your argument. The yellow light will mean you have two minutes or less. And then when the red light comes on, we ask that you conclude your sentence and yield the podium. So we'll go ahead and start this morning. The case is Green v. HCTec Partners, LLC. If I'm pronouncing that correctly. Number 24-20554. Mr. Mehta, if you would like to take the podium and begin. Can the court hear me? May it please the court, my name is Sanat Mehta and I represent Karen Green, the appellant in this case. Ms. Green brings this appeal to seek reversal of the United States District Court for the Southern District of Texas' ruling granting summary judgment to defendant and appellee HCTec on her Title VII case for sex discrimination, race discrimination, retaliation, and hostile work environment after she was abruptly fired by HCTec in 2021. And Ms. Green asks this court to remand the case to the District Court so that she can try her case before a jury. The standard of review on appeal for a grant of summary judgment is de novo. So this court should not defer to the decision below on questions of law. And according to Rule 56, the standard for summary judgment is that it should be granted only if there is no In this case, Ms. Green has provided strong evidence that race, sex, and retaliation motivated HCTec's decision to terminate her, and that the reasons given by HCTec for terminating her are unworthy of credence and are pretextual. Accordingly, there is a genuine dispute as to the material facts in this case, and HCTec was not entitled to prevail without a trial. This case falls under the McDonnell-Douglas framework set out by the Supreme Court five decades ago. The first step in that framework is to determine whether the plaintiff has made a prima facie case of discrimination or retaliation. And here, notably, the District Court agreed that Ms. Green had established a prima facie case. She was, in fact, treated less favorably than her white male counterpart, Ryan Nolan, who was in a parallel role with the same title as her. And so having made that showing, the burden shifted to HCTec to provide non-discriminatory, non-retaliatory reasons for terminating Ms. Green. HCTec provided some reasons, and then the District Court accepted those reasons from HCTec without very much discussion, and despite Ms. Green's persuasive facts disputing those reasons and showing that they were pretextual. The Court stated, quote, It is this holding which we contest today. Ms. Green does dispute the reasons. For example, she disputes that she was reluctant to speak with her subordinate, Hashim Redick, and that she was opposed to speaking to him one-on-one because of his Middle Eastern ethnicity. She disputes the fact that she improperly copied a client of HCTec's on an email and was insubordinate in the way she emailed that client. And she disputes the fact that her performance was poor at the company. Moreover, even HCTec, in its brief before this Court, does not defend very strongly its decision to terminate Ms. Green. HCTec instead pivots to the argument that even if the reasons it has given for terminating Ms. Green are not very credible, even if they're unreasonable, the employer is, quote, so long as there is no discriminatory animus. HCTec relies on this Court's decision in Owens v. Circassia Pharmaceuticals from 2022 in making that argument. In other words, HCTec argues that—HCTec essentially attempts to sidestep the McDonnell-Douglas framework. HCTec argues that even if the plaintiff made a prima facie case, which the district court agreed here, and even if the plaintiff shows that the defendant's reasons for the termination lack credibility, even in those circumstances, the plaintiff must still show some additional evidence of racial or gender animus in order to defeat summary judgment. Now, the court below didn't really get into that argument. The court below found without much discussion that Green didn't create a genuine issue of fact here as to the credibility of HCTec's reasons for terminating her. Now, turning to this Court's decision in Owens v. Circassia— Before we move off of what the district court did, can you help me understand how summary judgment interacts with the McDonnell-Douglas standard? Do you remember the procedural posture in McDonnell-Douglas itself? I'm not sure about McDonnell-Douglas itself. I know that the follow-up cases like Reeves v. Sanderson and St. Mary's Honor Center v. Hicks, those have tended to involve judgment as a matter of law. Yeah, so McDonnell-Douglas itself, similar. It's after a bench trial. And so the question in McDonnell-Douglas is, how do we get to the ultimate question of liability? So I don't understand—I'm curious what your view is—how that gets mediated through Rule 56 in summary judgment. Is the idea that you as the plaintiff have to create a material issue of genuine fact—a genuine issue of material fact as to each one of the three, or maybe just your two, the prima facie and the pretext? Yes, that is our position. And why would that be true? Because summary judgment is—to grant summary judgment is in some ways a more aggressive move by a court than to grant judgment as a matter of law. Because with summary judgment, the plaintiff is denied the opportunity to call witnesses into court and to cross-examine the witnesses of the opposing side. Especially in a case like this one where credibility of witnesses is a huge issue, it would be extremely helpful to have a trial in a case like this. And then if the court found that based on that trial there's no reason to let it go to the jury because all the factual disputes can only reasonably be resolved one way, then that's one thing. But here the case wasn't allowed to go to trial at all. It was decided based on declarations and depositions, which are inherently limited in their scope. So I would respectfully submit that the bar for granting summary judgment is higher than the bar for granting motion for judgment as a matter of law. I agree with you. And that's why I'm asking this question. I would think that your position would be that McDonnell Douglas shouldn't apply at the summary judgment stage for the exact reason you just gave. Rule 56 says you just have to create a material issue, a genuine material fact, as to whether your client was suffering an adverse employment action because of one of the enumerated factors. And that has nothing to do with McDonnell Douglas. So why are you asking us to apply McDonnell Douglas here? McDonnell Douglas is a helpful case from our perspective because it involves how to prove. It involves this multi-step analysis for showing discrimination where you don't have a smoking gun, so to speak. Ms. Green does not assert in this case that her supervisor used racial slurs against her or something like that, which would be very direct evidence of racial animus. So McDonnell Douglas clarified that you can bring a racial or gender discrimination case based on circumstantial evidence. And you have this multi-step analysis where you make the prima facie case, and then defendant offers reasons for termination, and then the plaintiff rebuts those reasons. And that's why McDonnell Douglas is a helpful case for us. Even though it makes the standard harder for you? Or that we just established that? We agree that McDonnell Douglas sets a higher standard for judgment as a matter of law. The sense in which the case is helpful to us is it allows a plaintiff to show discrimination based on circumstantial evidence, but without showing direct evidence of motive. You can show it indirectly by showing that the defendant's reasons are pretextual. What is the state of the law with respect to intersectional Title VII claims? With respect to intersectional Title VII claims, there's not a lot of well-settled law on that, is my understanding. However, we would ask that if we've made both a race discrimination and a sex discrimination case in the district court, and the supervisor here who terminated Ms. Green was an African-American man. He did so in consultation with others at the company who were white. And, of course, our client is an African-American woman. So he, being an African-American man, certainly there's a high likelihood that he discriminated based on gender. What would be the high likelihood? What would be the basis for you saying that there's a high likelihood? Just the fact that she was replaced by a white male after her termination. And she was treated less favorably. The termination was not the only act of discrimination here. Even before she was terminated, she was treated less respectfully by her supervisor than Ryan Nolan, the white male who was in a similar position as her. And, for example, her supervisor, Mr. Rush, would answer his questions respectfully while ignoring her questions. And he used to add to her workload unreasonably while reducing his. That type of thing. So that was our prima facie case, which the district court agreed with. And then just the lack of credibility of the reasons given by HC Tech for terminating her, those give rise to a reasonable inference that there was discrimination here. Would the inference go away if she had been replaced with an African-American female? It would be weaker. However, the district court found that the record did not support that. I guess what I'm wondering is if your theory of Title VII puts HC Tech in a position where the only way to avoid a trial, at least in a Title VII suit under these facts, is to replace her with a similarly intersectional new employee, doesn't that itself violate Title VII? Because they're making decisions on the basis of enumerated characteristics. They're hiring a new person because of their intersectional race and sex. Your Honor, I understand that concern. However, again, the prima facie case is not enough here. The plaintiff has to rebut the reasons given by the defendant for terminating her as pretextual. So we're not saying that we can defeat summary judgment based solely on the fact that she was replaced by a white male. And that HC Tech, the only way to avoid summary judgment here was to replace her with another African-American woman. What we're saying is that they should have had a better reason for firing her if they were going to fire her. And the reasons that they've given here lack credibility. So if they had good reasons for firing our client, which they didn't, then they could replace her with a white male. And they would still win this case. But the reasons that they've given are not credible. Could they have fired her for no reason? They have fired her for... They legally, yes, you could fire someone for no reason. However, the law presumes... The point of McDonnell Douglas and similar cases is that if it looks like somebody was fired for no reason, or the defendant gives no credible reason, and the plaintiff was replaced by someone of a different race or gender, then the law should be highly suspicious of that and find that discrimination is a likely inference, especially if there is disparate treatment leading up to the termination. Again, the termination was not the only moment of discrimination here. Ms. Green was treated unfavorably in the months leading up to her termination by her supervisors. And that's an important part of our case, which the district court agreed with. I note here that the remedy that Ms. Green seeks is quite modest. In the Supreme Court case St. Mary's Honor Center v. Hicks, the plaintiff argued for judgment as a matter of law based on a prima facie case and pretext. And four out of the nine Supreme Court justices actually accepted that argument, that the plaintiff should win without a trial if they show those two things. The five-justice majority disagreed. But here we're not arguing that Ms. Green should automatically win this case. Ms. Green is simply asking to go to a jury so that she can try her case and call witnesses, which is an important part of due process under our system. Thank you. Your Honors. Let's hear from Mr. Scott. Mr. Mayta, you have four minutes of rebuttal time remaining. And we'll hear from counsel for H.C. Tech. Thank you, Your Honors. May it please the Court. Good morning. We are here on a record that is clear that the appellant, Ms. Green, worked for H.C. Tech for three years. And during the first two and a half years, she testified that there were no issues. She was comfortable with her supervisor, who was Mr. Rush. As counsel admitted during argument, Mr. Rush is African-American, and he was Ms. Green's supervisor throughout her entire employment of three years. So based upon her testimony, there were no issues whatsoever in the first two and a half years. She was completely comfortable interacting with her African-American supervisor. And then she's promoted. And let me back up to add that she worked remotely throughout her employment. So she's promoted to a manager position. And after that, she engages in certain behaviors that ultimately lead to her termination. So this case is really focused on whether or not the appellant can and has shown pretext on this record sufficient to survive a motion for summary judgment. And the district court said that she had not. So what she tries to do is she tries to show discrimination in two ways. One, she says that she had a perception that her supervisor, Mr. Rush, was more responsive to a male individual who was another manager that reported to Mr. Rush, one. And two, her perception is she had a greater workload than this other individual. His name is Ryan Noland, as the record indicates. So that was it. First, when asked in her deposition, what evidence do you have that the assignment of work was in any way based on your race or gender, she said none other than the fact that I had six teams reporting to me and Mr. Noland only had four teams reporting to him. But that was explained, and the difference was explained in Mr. Rush's declaration that's before the court. And he simply said, look, I'm responsible for the assignment of the teams and the workload. I look at the relative experience of the two managers. And in this instance, I made the decision to have six teams reporting to the plaintiff and four to Ryan Noland, because the four that were reporting to Ryan Noland involved greater responsibility, greater tasks and duties. So that was adequate. The reasons for the termination, the specific reasons, as I understand it from the record, correct me if I'm wrong, one was copying a client on an e-mail that was intended to be or should have been an internal e-mail. A client was copied with information that HCTech did not want exposed to outside a valuable client. That's number one. Number two is an e-mail wherein the plaintiff described a subordinate employee, a Middle Eastern employee in somewhat questionable terms. And the only dispute on that e-mail, as I understand it, is that she claimed she was reciting someone else's concerns as opposed to her own concerns. Are those the two? Is there anything else for reason for her discharge? I think, Judge Engelhardt, you've correctly summarized the two incidents that happened to occur on the same day, which was May 13th, 2021, the date of her termination. There is, in the record, if you look at the HR partner who Mr. Rush made the decision, but of course he partnered with his human resources business partner, Ms. Maiolo, and in there there is an indication that there were other issues that were going on after she was promoted to manager, but certainly the two biggest ones were the two issues that you just described. And let me go back to something that counsel said because we strongly disagree with that statement, which is HCTEC did not strongly defend the reason for termination. That's not the point at all. And back to Judge Oldham's question earlier, why do we have this framework? The framework, as I understand it, why McDonnell Douglas came about is we know that Title VII and the discrimination laws require intentional discrimination, intent to discriminate. That's a very big word. And so the U.S. Supreme Court was trying to devise a framework to ferret out, for lack of better words, claims that don't even pass GO in the employment context. So they came up with the prima facie framework to say, look, you have to establish these, whatever the permutation or the exact formula or makeup of the prima facie case in the given case is, you have to do that before you even pass GO and then shift the burden of production only, not persuasion, to the employer to articulate the reasons that we just talked about. Why? Because we know ultimately it's an intent to discriminate, and then this Court, when we get to the Owens case, it's very important because this case is all about the pretext issue. And in the Owens case, this Court described what it would take for an employer, excuse me, an employee, once the employer articulates a legitimate non-discriminatory or retaliatory reason or reasons for the termination decision, to defeat those and get past a motion for summary judgment. Judge, you were going to? Just before we move off of the Supreme Court, I want to make sure I understand, because my question was not, why do we have McDonnell Douglas? My question is, why do we have McDonnell Douglas at summary judgment? So you say, well, the Supreme Court devised it as a rule and a burden-shifting framework to weed out claims that don't get past GO. Of course, McDonnell Douglas is a bench trial, right? We got all the way to trial, all the way to judgment. As your friend on the other side pointed out, there are other judgment as a matter of law cases, and I'm curious if you know, because I don't, whether the Supreme Court has ever embraced applying McDonnell Douglas at summary judgment, or motion to dismiss for that matter. I can say this, that, you know, McDonnell Douglas was certainly amplified in later Supreme Court decisions, starting with Burdine, in which the Court reemphasized that we're looking at intent to discriminate. Not summary judgment. And then we get to Reeves and Hicks after that. As far as I know, they've never said that it applies at summary judgment, and so I'm curious. I mean, you led off the argument with pretext. I understand that the parties have briefed this case as a pretext case. It's just a little unclear to me why we would apply the burden-shifting framework at Rule 56. I mean, sorry, at summary judgment, Rule 56 is pretty clear, right? Rule 56 tells you what you have to get by on summary judgment. It says you have to have a genuine issue of material fact as to a violation of the statute. That is that your client terminated or took another adverse employment action against your friend on the other side's client because of race or sex. And the way I would answer that, Judge Oldham, is in case after case after case before this Court, over many years after McDonnell Douglas was decided, this Court has employed or embraced, adopted, excuse me, the McDonnell Douglas framework in summary judgment cases, including, most specifically, the 2022 decision of this Court in the Owens case. And then the next year was the January v. City of Huntsville case, where that same framework was adopted to affirm a summary judgment on a retaliation claim. And both of those cases, I think, are very instructive here because those are the claims we're dealing with here. We're dealing with claims of race discrimination under Title VII and Section 1981, gender discrimination under Title VII, and then retaliation. So back to that point. So I think what the Court is doing and what this Court has done is, look, we have to have some mechanism and framework at the district court level to figure out is this something that should get to a jury. And that was the specific question that was addressed to the Court in the Owens case and what the Court says is, look, once you pass the, and these are different phases, once you pass the prima facie stage, you get to the employer's burden of production, and appellant Ms. Green admits that H.C. Tech has satisfied that. Now we look at what does it take to show pretext and what does pretext mean? The Supreme Court has said that pretext means that you have to show both that the reason is false and that there has to be sufficient evidence to infer that the real reason is the prohibited reason. And that's really what Owens is about, is looking at, as the Court put it, what's the nature, extent, and quality of the evidence here. And we look at that in the context of this record. It's clear that the district court got it right. If you look at the Owens case, the arguments of pretext that the plaintiff was making in that case, very similar to the arguments in this case. And, in fact, I would venture to say the evidence in that case was even stronger in terms of what the plaintiff presented to show pretext or falsity of the articulated reason in this case. Let me back up, too, because I think there's a couple of important concepts here. So we know that ultimately the burden on these statutes is intentional discrimination or but for retaliation. And that means that once the employer meets the, satisfies the burden of production, which they concede was met here, now we need something that is of substantial quality, nature, extent, and quality. As this Court has put it several times, including in Owens and in the 2023 January v. City of Huntsville case, that has to be a substantial showing. Why? Because if you don't have that in place, we're going to start questioning every decision that employers make. And then you could come in and just say, look, I disagree with the wisdom of that. In fact, counsel said something very similar to that just a few minutes ago, which is, in their opinion, H.C. Tech should have had a better reason for termination. That's not their decision to make. And this Court has made that clear, including in the Owens case. Very clearly there's a reason why we have that, that language that the Fifth Circuit and other courts don't sit and district courts don't sit as super HR departments to question the wisdom or fairness or reasonableness of a decision. We're focused on the why and not the how. Their evidence of pretext, in my humble opinion, goes more to the how. You heard counsel say it was an abrupt termination. That goes to how, not why. You heard counsel say, or in the brief they say, that, well, the progressive disciplinary policy wasn't followed. Well, she's a manager, one. They attached the progressive disciplinary policy to their summary judgment response, and that policy clearly says that H.C. Tech, the employer, has discretion to determine what's the appropriate disciplinary measure up to and including termination based upon the individual facts. This Court has said in the Salazar case in 2020 that when you have that kind of language in a handbook, the employer doesn't have to follow it. It's not for this Court to question the wisdom or whether the employer got it right or made a mistake. The issue is intent, motive, why, not how. And I think that's a critical distinction that's a current thread throughout all these cases, which is, look, let's get to the why. And based upon the language that this Court employed in Owens, the why has to be challenged with sufficient evidence of a nature, quality, and extent that's substantial, that not only deems the articulated reason, but is sufficient to reasonably infer that the real reason is fill-in-the-blank. Here it would be race, gender, or alleged protected activity. That's where, like the recent cases in the January versus the City of Huntsville and also in Owens, the case falls apart. So even if she's right that she disagrees and that that somehow calls the employer's articulated reasons into question, that's not enough. Owens says, no, that's not enough. Why? Because we're not here to question whether it's right. We're here to look at motive. And also, it's not enough to just deem the reason or show some factual discrepancies. You've got to do more. And the court got it right, district court got it right in that case in Owens in January. The district court got it right here. And those precedents, I believe, are very important and very instructive in this case. So I want to address briefly this notion of alleged comparatory evidence. It wasn't really developed that much by the appellant in argument. But essentially what she's trying to do is point the finger at Ryan Nolan and say, he was treated better than I was. But when you look at that, there's essentially two things. One is her perception that her work, that he was, excuse me, Bernard Rush, the supervisor, was more responsive to Ryan than he was to her. There's no substantiation. That's just her subjective belief that that happened. And, oh, by the way, that's really the only thing that she raised with HR. When she goes to HR, it was to complain about the perceived lack of responsiveness to her and better responsiveness to Ryan. That was it. She didn't raise any of these other issues. That's clear from her testimony that's in the record. And then the other way that she tried to compare herself is the workload. But we've talked about that. Mr. Rush explains his nondiscriminatory, legitimate rationale. He's the one that makes the decisions. And she never complained about her workload or anything like that. Also, Mr. Rush says in his declaration, excuse me, I may have called an affidavit, in his declaration in the record that he made those decisions to assign the teams to Ryan and to Karen Green before he was aware that Ms. Green had gone to HR to complain about his perceived lack of responsiveness to her. The only other way that she tries to look at bringing comparative evidence is through alleged lack of counseling of her and a termination based upon this one incident that we talked about with Centura. And let me talk about the strength of that, because as I believe it's on page 16 of their brief, they admit that it's their burden to show pretext on every reason that's articulated by the employer, and that's important. They also talk on page 24 about how it's important not to focus on whether the reasons are mistaken, but the issue is motivation. So both of those things are admitted in their brief. So back to where we were. When you look at comparative evidence, and again, this was not really developed, but I want to address it, is this vague notion that she received harsher treatment in terms of discipline than Nolan did. Again, Mr. Rush explained why Ryan Nolan received counseling in his declaration, and it's apples and oranges. This court, going back to the Lee decision, I believe it was, when it talked about what's legitimate comparative evidence, sets the standard that it has to be basically nearly identical circumstances, one, and two, if the difference in conduct accounts for the difference in treatment, that's not discrimination. It can't be used to, no inference can be drawn from that to show a discriminatory intent. That's exactly the situation here. Mr. Rush explained why Ryan Nolan received counseling, and that is he had communications with one of his subordinates about a best practice in responding to a service ticket from one of the clients, and that was the nature of the communication. And so both of them, the subordinate and Ryan Nolan, received counseling over that. Apples and oranges. Here, back to your question, Judge Engelhardt, earlier, really important to look at the communications that are in the record with this very big client, which is Centura, on May 13, 2021. And those emails show that Karen Green says, look, client says we needed additional resource allocated to our project. She says we've looked at it. I think we can get by with one. Client comes back and says, we want two. We want two resources there. She comes back again and says, nope, we've looked at it. I think we can get by with one, and we will have a backup there if it's needed. Well, Bernard Rush looks at that and goes, what are you doing? And he's copied on all of this, and he says, you're disagreeing basically with a major client. They're telling us that they want two, not one resource allocated to their project, and that they need it. And you're basically arguing with them. And also, you know, from that, he's saying that she's undercutting his authority, that she's being defiant, that it's a bad, looks very negative in front of the client, that you're disagreeing with them. I appreciate the factual discussion, but can we talk? I have a legal question before your time expires. Can you bring an intersexual discrimination claim under 1981? I have never seen it. Well, the answer is no, because intersection 1981 is a race discrimination statute only. So the only vehicle for that would be under Title VII, which prohibits both or prescribes intentional discrimination on the basis of gender and race. Counsel, I understand. That's obviously correct as to 1981. What is the authority for bringing one under 1980? I'm sorry, under Title VII, excuse me. I think there are cases that recognize that as a theory. As I understand their specific claim, Judge Oldham, though, in this case, is it's really, and again, if you look at the record, plaintiff, Ms. Green, wasn't able to articulate any discriminatory animus based upon gender or race, but she kind of looks at them as different silos. I'm a woman, so check off the box. I can meet the prima facie case under Title VII, showing one of the elements that I'm in a protected category, and over here, I'm African American, so I can check off the box as race. In my humble opinion, if you look at their response to the same actor inference, which is for sure an issue in this case and part of the overall backdrop here. Why? Because Mr. Rush is African American. Mr. Rush interviewed her, was involved in her hiring, was involved in her promotion, and he's the one that made the termination decision. So I think that they added the female because that's trying to draw a distinction between Mr. Rush, the immediate supervisor, and her. Thank you, Mr. Scott. Thank you, Your Honors. We have the final time of four minutes for the appellant. May it please the Court? So I'd like to respond to some of the points that have been brought up. So first, as to intersectional discrimination, I would point out this. This Court did recognize, in passing, in a case called Martin v. Hudson, May 19th of this year, that suits for intersectional discrimination based on a combination of a plaintiff's race and sex may be cognizable under Title VII. And we would also submit that if this Court finds that there is a genuine dispute as to either race discrimination or sex discrimination or both, any of those would be a reason to reverse the summary judgment ruling and remand for trial. As to the same actor inference, which is that Bernard Rush hired Ms. Green, and then because of that, it's unlikely that he would discriminatorily fire her, our response there is that he was one of only three or four directors who were interviewing her for the promotion and involved in promoting her, whereas he was largely acting alone with only a rubber stamp from HR when he fired our client, and he did so hastily. And plus, as to the retaliation count, I mean, he may have been angered, or was likely angered, by Ms. Green's complaints of race and sex discrimination after the promotion, and so the same actor inference wouldn't help with that. Moving to the applicability of Owens v. Circasia. So that was the case where this Court essentially decided that the plaintiff can show a prima facie case, and the plaintiff can even rebut and show that the defendants' reasons are not credible, but defendants can still win on summary judgment because plaintiffs don't have additional evidence beyond the prima facie case and showing pretext. We acknowledge that holding, but we also would point out that that decision on its own terms is sort of an exception. The more usual case is something like Laxton v. Gap from 2003. The Supreme Court said in Reeves that ordinarily it is enough for a plaintiff to make a prima facie case, and then when the defendant gives reasons for termination, for the plaintiff to then cast doubt on those. Ordinarily that is enough to defeat summary judgment or to defeat judgment as a matter of law, but there will be some cases where that's not the case. And this Court in Owens said, you know, the Supreme Court warned us of those exceptions, and this is one of those exceptions. However, HCTEC has not really shown why this case is like Owens as opposed to the more usual case of Laxton v. Gap. And if you look at what happened in Owens, the employer there was quite thoughtful about the employee's performance. They put her on a 60-day performance improvement plan and fired her on the 57th day of that. Here the termination was much more rushed and thoughtless, and our client was not given any second chances or counseling. And as to opposing counsel's point that it's not our prerogative to decide whether HCTEC should have had a better reason for terminating our client, we're not suing them for not having a better reason. Our point is that the weakness of the reasons they've given for the termination shows that those reasons are unworthy of credence and that they weren't the real reasons. That's the whole point of the McDonnell-Douglas framework, is to smoke out discrimination by requiring when there's a prima facie case, the defendant has to provide reasons. And if the plaintiff can show that those reasons are not credible, then the plaintiff deserves to at least have a trial by jury and to cross-examine witnesses, and that's what we seek in this case. Thank you, Your Honors. Thank you, Counsel. Thank you both for your briefing in this case and for your presentations here today. The matter is submitted, and this concludes the oral argument portion of this panel's work. The Court will stand adjourned.